**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*pro hac vice* forthcoming)
Andrew J. Obergfell (*pro hac vice* forthcoming)
Max S. Roberts (*pro hac vice* forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jarisohn@bursor.com
            aobergfell@bursor.com
            mroberts@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHERI LEONARD, on behalf of herself and all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| CVS PHARMACY, INC., AMNEAL PHARMACEUTICALS, INC., and AMNEAL PHARMACEUTICALS LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Cheri Leonard ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following on information and belief, except that Plaintiff's allegations as to her own actions are based on personal knowledge:

<u>**NATURE OF THE ACTION**</u>

1.      This is a class action lawsuit regarding Defendants CVS Pharmacy, Inc.'s ("CVS"), Amneal Pharmaceuticals, Inc.'s, and Amneal Pharmaceuticals, LLC's (collectively "Amneal") (CVS and Amneal are collectively referred to as "Defendants") manufacturing, distribution, and sale of guaifenesin-containing medications with inactive ingredient carbomer manufactured by Defendant Amneal that contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia, lymphoma, and other cancers.

2.      The guaifenesin-containing medications sold by CVS include generic versions of the brand-name drug Mucinex.  The products at issue in this matter are all medications sold by CVS containing the inactive ingredient carbomer, including: (1) CVS-branded Maximum Strength Mucus Extended Release, Guaifenesin Extended-Release Tablets, 1200 mg; (2) CVS-branded Mucus Extended Release, Guaifenesin Extended-Release Tablets, 600 mg; (3) CVS Health 12HR Maximum Strength Mucus DM Extended Release Tablets, 1200mg/60mg; (4) CVS Health 12HR Mucus DM Extended Release Cough Tablets, 600mg/30mg; and (5) CVS Health 12HR Maximum Strength Cough and Congestion Relief Extended Release Tablets (the "Products").  The Products are over-the-counter drug products offered for sale at CVS retail locations nationwide.

3.      The Products are not designed to contain benzene in the finished Products, and the use of benzene in the manufacturing process is not "unavoidable."  Thus, the presence of benzene in the Products renders them misbranded, and therefore illegal to sell under both federal and California law. As a result, the Products are unsafe and illegal to sell, and therefore worthless.  *See* 21 U.S.C. §§ 331(a), 352.

4.      Carbomer is an inactive ingredient in both brand name Mucinex as well as generic formulations, including the Products sold by CVS.  The carbomer used in brand name Mucinex

does not contain benzene, but the carbomer included in the CVS-branded Products does contain benzene.

5.      Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.  The Department of Health and Human Services has determined that benzene causes cancer in humans.  Likewise, the Food and Drug Administration ("FDA") lists benzene as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."

6.      Benzene is associated with blood cancers such as leukemia.[1]  A study from 1939 on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe,"[2]  which is a comment reiterated in a 2010 review of benzene research specifically stating: "There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[3]

7.      According to the American Cancer Society:

> IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.[4]

8.      According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, skin absorption, **ingestion**, skin and/or eye contact."[5]

---

[1] National Cancer Institute, Cancer-Causing Substances, Benzene. https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.

[2] Hunter, F.T. (1939). Chronic Exposure to Benzene (Benzol). II. The Clinical Effects. *Journal of Industrial Hygiene and Toxicology*. 1939 Vol.21 pp.331-54, https://www.cabdirect.org/cabdirect/abstract/19402700388.

[3] Smith, Martyn T. (2010). Advances in Understanding Benzene Health Effects and Susceptibility. *Annual Review of Public Health*. 2010 Vol. 31:133-148, https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

[4] American Cancer Society. Benzene and Cancer Risk (January 5, 2016) (https://www.cancer.org/cancer/cancer-causes/benzene.html)

[5] National Institute for Occupational Safety and Health (NIOSH), Benzene, https://www.cdc.gov/niosh/npg/npgd0049.html.

9.      CVS distributed and sold the benzene-contaminated Products, which were manufactured by Amneal.

10.      In late December 2023, the United States Food & Drug Administration ("FDA") published a final guidance for industry titled "Reformulating Drug Products That Contain Carbomers Manufactured With Benzene."[6]  The FDA explained that the purpose of the guidance was "to provide recommendations to applicants and manufacturers on what tests should be performed and what documentation should be submitted or available to support the reformulation of drug products that use carbomers manufactured with benzene."  The FDA explained that United States Pharmacopeia ("USP")[7] "carbomer monographs[8] currently allow for unacceptable levels of benzene, which raises safety concerns," and "requested that the USP omit (or remove) these monographs, and applicants and manufacturers may need to reformulate their drug products to avoid use of these carbomers."

11.      The FDA noted the "immediate public health need to expedite the discontinuation of the use of carbomers manufactured with high levels of benzene in drug products," such as the Products.  The FDA further acknowledged that "benzene is a known human carcinogen, and the Agency seeks to facilitate the transition away from using carbomers manufactured with high levels of benzene."

12.      The FDA further noted that certain carbomers "currently used as inactive ingredients that are manufactured using benzene as a polymerization solvent" even though benzene is a known human carcinogen and a Class I solvent (meaning a solvent "that should be avoided").  The FDA's emergency guidance made clear that "benzene should not be employed in the

_____

[6] https://www.regulations.gov/document/FDA-2023-D-5408-0001 (last visited 8/28/24).

[7] The USP is a compendium of drug information published annually "includes over 5000 quality standards for medicines, both chemical and biologic; active pharmaceutical ingredients (APIs); and excipients (inactive ingredients)."  *See* https://www.usp.org/about/public-policy/overview-of-monographs (last visited 8/28/24).  The quality standards published therein "are used to help ensure the quality of medicines and their ingredients, and to protect the safety of patients."  *Id.*

[8] A monograph is one of several quality standards for medications and articulates "the quality expectations for a medicine including for its identity, strength, purity, and performance. They also describe the tests to validate that a medicine and its ingredients meet these criteria."  *See* https://www.usp.org/about/public-policy/overview-of-monographs (last visited 8/28/24).

manufacture of drug substances, excipients, and drug products" and, importantly, that "alternative grades of carbomers are available that are manufactured without the use of benzene."

13.     In other words, *every* Product manufactured and sold by Defendants contains unsafe levels of benzene as a result of the Products' formulation process, even though (i) alternative carbomers exist that do not contain or utilize benzene in the manufacturing process, and (ii) Defendants did not disclose this issue to consumers.

14.     The level of benzene contamination in certain carbomer formulations can be astronomically high, namely as high as 5,000 parts per million (ppm).  For reference, the upper limit for benzene as an impurity is 2 ppm.  Notably, the 2 ppm threshold for benzene is only if the use of benzene is unavoidable in manufacturing the product, whereas here there were monographs of carbomer available that did not require the use of benzene.

15.     Amneal used a benzene containing version of carbomer, even though other non-benzene containing formulations were possible.  A company representative of Amneal stated to media outlets that the company plans to submit a reformulated product to the FDA by the end of 2024.[9]  However, it has been manufacturing the Products containing benzene for sale to Plaintiff and class members, who have unknowingly been purchasing and consuming Defendants' Products containing dangerously high levels of benzene.

16.     The dangers of benzene and its inclusion into drug products has been known for some time.  Indeed, since 2021 there have been several recalls of drug products due to the presence of benzene, and third-party laboratories have discovered the presence of benzene in drug and cosmetic products.  These recalls and tests should have placed Defendants on notice regarding the presence of benzene and caused them to cease from manufacturing drug products containing benzene.  Nevertheless, Defendants continued to manufacture the products at issue using benzene, which exposed Plaintiff and class members to high levels of benzene contamination.

---

[9] https://nypost.com/2024/08/12/business/generic-version-of-mucinex-sold-by-cvs-walmart-walgreens-and-target-contain-cancer-causing-chemical-report/ (last visited 8/28/24).

17.     Neither Amneal nor CVS disclosed the presence of benzene in its guaifenesin-containing medications on the Products' labeling, or in any advertising or website promoting the Products.  Defendants did not disclose the presence of benzene in the products to Plaintiffs or Class members at the point of sale or at any time before the point of sale.

18.      Indeed, there is no reasonable means for Plaintiff or class members to have discovered the presence of benzene in the Products because the inactive ingredients list on the Products' labeling merely states "carbomer" but does not disclose the presence of benzene, nor does it disclose that the carbomer in the products was formulated using benzene in dangerously high amounts:



19.     Further, had Defendants adequately tested the Products for benzene and other carcinogens, reproductive toxins, and impurities, it would have discovered that its Products contained benzene at dangerously high levels.

20.     Defendant also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."

21.     Thus, if Plaintiff and Class members had been informed that Defendants' Products contained benzene, they would not have purchased or used the Products at all, or would have paid significantly less for the Products, making such omitted facts material to them.

22.     Plaintiff and Class members were injured by the full purchase price of the Products because the Products are worthless, as they contain harmful levels of benzene and Defendants have failed to warn consumers of this fact.

23.     Plaintiff and Class members are further entitled to damages for the monies paid to purchase the Products, statutory and punitive damages, attorneys' fees and costs, and injunctive relief.

24.     Plaintiff brings this action on behalf of herself and a proposed class for damages and equitable relief for: (i) breach of the implied warranty of merchantability, (ii) unjust enrichment, (iii) fraud, and (iv) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*

## **PARTIES**

25.     Plaintiff Cheri Leonard is a resident of Ben Lomond, California.  In approximately July 2024, Plaintiff purchased CVS-branded Maximum Strength Mucus Extended Release, Guaifenesin Extended-Release Tablets, 1200 mg from a CVS retail location in Felton, California. When purchasing the product, Plaintiff reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendant that the product was properly manufactured, free from defects (including carcinogenic impurities such as benzene), safe for its intended use, not misbranded, and legal to sell.  The Product contained no representation that it contained benzene.  Instead, the label simply lists "carbomer" as an inactive ingredient with no indication that benzene was used in the formulation of the carbomer and contaminated the finished product.  Plaintiff relied on these representations and warranties in deciding to purchase the product manufactured and sold by Defendants, and these representations and warranties were part of the basis of the bargain in that she would not have purchased the product from Defendants or would have paid less for it had she known that benzene—in particular, highly unsafe levels of benzene—was used in the formulation of the Product, and that the Product was not properly manufactured and free from defects like the benzene contamination.  Moreover, the presence of unsafe levels of benzene in the Product rendered it unsafe to use, worthless, and illegal to sell.

Accordingly, Plaintiff was injured and lost money as a result of Defendants' deceptive and unfair conduct.

26.     Defendant CVS Pharmacy, Inc. is a Rhode Island corporation with a principal place of business located at One CVS Drive, Woonsocket, Rhode Island 02895.  CVS Pharmacy sells the Products throughout the United States, including in the State of California.  The Products, including those purchased by Plaintiff and Class members, are available at CVS retail locations throughout the United States, including in the state of California.  CVS Pharmacy authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of the Products.

27.     Defendant Amneal Pharmaceuticals, Inc. is a corporation incorporated under the laws of Delaware with a principal place of business at 400 Crossing Boulevard, Third Floor, Bridgewater, New Jersey 08807.  Amneal conducts substantial business in the United States, and specifically in the State of California.  Amneal has been engaged in the manufacturing of the Products in the United States, including in the State of California.

28.     Defendant Amneal Pharmaceuticals LLC is a corporation incorporated under the laws of Delaware with a principal place of business at 400 Crossing Boulevard, Third Floor, Bridgewater, New Jersey 08807.  Amneal conducts substantial business in the United States, and specifically in the State of California.  Amneal has been engaged in the manufacturing of the Products in the United States, including in the State of California.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

30.     This Court has specific personal jurisdiction over Defendants because this action arises out of and relates to Defendants' contacts with this forum. Specifically, Defendant Amneal knowingly placed the Products into the stream of commerce directed into California.  CVS

Pharmacy sold the Products in its retail locations within California where Plaintiff purchased the CVS-branded Maximum Strength Mucus Extended Release, Guaifenesin Extended-Release Tablets, 1200 mg product.  Defendants have advertised and marketed within California through the wires and mail and via e-commerce websites through which residents of California can purchase the Products.  Further, Defendants knowingly direct electronic activity into California with the intent to engage in business interactions and have in fact engaged in such interactions.

31.     CVS also consented to personal jurisdiction in California because, at all times material to this action, it was registered to do business in California and appointed a registered agent for service of process in California.

32.     Amneal consented to personal jurisdiction in California because, at all times material to this action, it was registered to do business in California and appointed a registered agent for service of process in California.

33.     Venue is proper in this Court under 28 U.S.C. § 1391 because Plaintiff resides in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District because Plaintiff purchased the CVS-branded Maximum Strength Mucus Extended Release, Guaifenesin Extended-Release Tablets, 1200 mg product in this District.

**FACTS COMMON TO ALL CAUSES OF ACTION**

**I.     CVS BACKGROUND**

34.     CVS is a retail pharmacy chain with over 9,000 locations throughout the United States.

35.     CVS sells CVS-branded over-the-counter medications at its retail locations, including the Products.

36.     The Products' labels do not reference the presence of benzene, nor do they state that the carbomers used as inactive ingredients were manufactured using benzene as a solvent, as can be seen on the labeling of the product Plaintiff purchased:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28




## II.    AMNEAL BACKGROUND

37.     Amneal is a global pharmaceutical company that develops, manufactures, markets, and distributes generic pharmaceuticals.  Amneal Pharmaceuticals Inc. sells to chain pharmacies, such as CVS, as is the case with the Products in this matter.

38.     Amneal Pharmaceuticals Inc. is a holding company whose principal assets are common units held in Amneal Pharmaceuticals, LLC, which manufactured the Products.

39.     Amneal Pharmaceuticals Inc. and Amneal Pharmaceuticals, LLC are alter egos of each other, as Amneal Pharmaceuticals Inc. is the sole managing member of Amneal Pharmaceuticals, LLC and has sole voting power to make all business decisions for Amneal Pharmaceuticals, LLC and controls its management.

40.     Amneal Pharmaceuticals Inc. and Amneal Pharmaceuticals, LLC manufactured the Products at issue in this matter and sold the same to CVS, which sold the Products at its retail locations throughout the United States and the State of California.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                    9

41.     Amneal Pharmaceuticals Inc. and Amneal Pharmaceuticals, LLC knowingly developed the Products using benzene, which resulted in dangerously high benzene concentrations in the Products.

42.     Amneal Pharmaceuticals Inc. and Amneal Pharmaceuticals, LLC knew that there were other possible formulations that would have excluded benzene but failed to use them.

### III.     BENZENE IS A KNOWN HUMAN CARCINOGEN

43.     A study from 1939 on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe,"[10] which is a comment reiterated in a 2010 review of benzene research specifically stating: "There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[11]

44.     Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.  The Department of Health and Human Services has determined that benzene causes cancer in humans.  Likewise, the Food and Drug Administration ("FDA") lists benzene as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."  Benzene is associated with blood cancers such as leukemia.[12]

45.     The CDC warns that "[b]enzene works by causing cells not to work correctly.  For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia.  Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."

---

[10] F.T. Hunter, *Chronic Exposure to Benzene (Benzol). II. The Clinical Effects*, 21 JOURNAL OF INDUSTRIAL HYGIENE AND TOXICOLOGY 331 (1939), https://www.cabdirect.org/cabdirect/abstract/19402700388.

[11] Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANNUAL REVIEW OF PUBLIC HEALTH 133 (2010), https://www.annualreviews.org/doi/full/

[12] National Cancer Institute, Cancer-Causing Substances, Benzene, https://www.cancer.gov/ about-cancer/causes-prevention/risk/substances/benzene

46.     According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, skin absorption, ingestion, skin and/or eye contact."[13]

47.     The FDA has made clear that benzene "is a known human carcinogen."[14]

## IV.     DEFENDANTS KNOWINGLY FORMULATED THE PRODUCTS USING BENZENE

48.     The benzene contamination in the Products derives from the use of the inactive ingredient carbomer.  Carbomers are "are a group of polymers composed of acrylic acid" that are "widely used as inactive ingredients in drug products as fillers, emulsifiers, gelling agents, and binding agents."[15]

49.     Some carbomers, like those used by Defendants in formulating the Products, "are manufactured using benzene as a polymerization solvent."[16]

50.     However, "both the International Conference for Harmonisation (ICH) guidance for industry entitled 'Q3C—Tables and List' … and USP General Chapter <467> 'Residual Solvents' designate benzene as a Class 1 solvent (i.e., solvents that should be avoided) and recommend that benzene should not be employed in the manufacture of drug substances, excipients [such as carbomers], and drug products."[17]  Yet, Defendants used benzene as a solvent in contravention of these standards and sold the Products to Plaintiff and Class members that contained high levels of benzene.  More than that, there were other methods of manufacturing carbomers that do not require using benzene as a solvent and therefore do not result in high levels of benzene in the finished product, which Defendants failed to use.

51.     Benzene-using monographs (like those used by Amneal) "permit benzene levels as high as 5,000 parts per million (ppm), which is significantly higher than the limit of 2 ppm on

---

[13] National Institute for Occupational Safety and Health (NIOSH), Benzene, https://www.cdc.gov/niosh/npg/npgd0049.html (emphasis added).

[14] https://www.regulations.gov/document/FDA-2023-D-5408-0001

[15] https://www.regulations.gov/document/FDA-2023-D-5408-0001

[16] *Id.*

[17] *Id.*

benzene as an impurity in the USP-NF Carbomer Homopolymer, Carbomer Copolymer, and Carbomer Interpolymer monographs."[18]

52.     In short, the manufacturing process through which Defendants manufactured the Products resulted in levels of benzene that far exceeded the impurity standard for benzene; an impurity standard that only exists if benzene is required for the manufacture of the product (which here, it was not).  Defendants could have avoided the use of benzene but failed to do so.

53.     Due to the danger of benzene and the use of benzene as a solvent in manufacturing carbomers, the FDA published emergency guidance "to expedite the discontinuation of the use of carbomers manufactured with high levels of benzene in drug products."[19]

## V.     THE PRESENCE OF BENZENE RENDERS THE PRODUCTS MISBRANDED AND ILLEGAL TO SELL

54.     The Products are "drug" products that are regulated by the U.S. Food and Drug Administration ("FDA"),[20] pursuant to the federal Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.*, as well as analogous state statutes and regulations, including California's Sherman Food, Drug, and Cosmetic Law, California Health & Safety Code §§ 109875, *et seq.* ("Sherman Law").

55.     The Products are misbranded because their labeling is "false" and "misleading" because it does not disclose the presence of benzene or the fact that the carbomers in the Products were manufactured using benzene as a solvent.  21 U.S.C. § 352(a)(1).

56.     A product that is "misbranded" cannot legally be manufactured, advertised, distributed, or sold.  21 U.S.C. § 331(a).  Misbranded products thus have no economic value and are legally worthless.

57.     California's Sherman Law expressly incorporates all drug labeling requirements set forth in the FDCA (*see* Cal. Health & Safety Code § 110100(a)), and further provides that any a drug is misbranded if it does not conform to FDCA requirements.

---

[18] *Id.*

[19] *Id.*

[20] See VALISURE CITIZEN PETITION ON BENZENE IN BENZOYL PEROXIDE DRUG PRODUCTS, at 3.

1    58.    Each of Defendants' violations of federal law and regulations violates California's

2    Sherman Law, including, but not limited to, the following sections:

3            (a)    Section 110100 (adopting all FDA regulations as state
                    regulations);
4
5            (b)    Section 111330 (false or misleading labeling);

6            (c)    Section 111400 (dangerous to health when used as
                    suggested);
7
8            (d)    Section 111440 (manufacture, sale, delivery, or holding
                    of misbranded drug or device); and
9            (e)    Section 111450 (reception or delivery of misbranded
                    drug or device).

10    59.    As alleged herein, Defendants have violated the FDCA, the Sherman Law, and the

11   "unlawful" prong of the UCL.  Defendants engaged in fraudulent, unfair, deceptive, misleading,

12   and/or unlawful conduct stemming from its misrepresentations and omissions surrounding benzene

13   contamination affecting the Products.

14    60.    If Defendants had disclosed to Plaintiff and putative class members that the

15   Products contained benzene and/or were defectively manufactured, Plaintiff and Class members

16   would not have purchased the Products or they would have paid less for the Products.  In fact,

17   Plaintiff and Class members could not have purchased the Products had these disclosures been

18   made because the benzene contamination rendered the Products adulterated, misbranded, and

19   illegal to sell.

20    61.    As the manufacturer and seller of an over-the-counter drug product, Defendants

21   had and have a duty to ensure that their Products did not and do not contain excessive (or any)

22   level of benzene, including through regular testing, especially before injecting the Products into the

23   stream of commerce for consumers to consume.  But Defendants made no reasonable effort to test

24   the Products for benzene, or to use alternative formulations that did not incorporate benzene.  Nor

25   did Defendants disclose to Plaintiff in any advertising or marketing that the Products contained

26   benzene, let alone at levels that are multiples of the impurity limits set by the FDA.  To the

27   contrary, Defendants represented that the Products were of merchantable quality, complied with

28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                          13

federal and state law, and did not contain carcinogens or other impurities such as benzene.

## VI.    DEFENDANTS' KNOWLEDGE, MISREPRESENTATIONS, OMISSIONS, AND CONCEALMENT OF MATERIAL FACTS DECEIVED PLAINTIFF AND REASONABLE CONSUMERS

62.    Defendants, large and sophisticated corporations that manufacture and sell pharmaceutical drugs, knew or should have known of the risks of using benzene as a solvent in manufacturing the Products and the risks of benzene being present in the Products through internal testing of the finished dose of the Products.  Indeed, Defendants were selling the Products even after the FDA's emergency guidance was issued and Plaintiff purchased the product approximately seven months following the FDA's emergency guidance.  Therefore, Defendants knew or should have known about the dangers of benzene in carbomers included in the Products prior to selling them to Plaintiff and Class members.

63.    Benzene is not listed on the Products' labels as an ingredient, nor is there any warning about the inclusion of benzene in the Products or the use of benzene as a solvent in manufacturing the Products.

64.    Further, the Products' labels refer to brand-name Mucinex, suggesting that the Products are the generic equivalent to brand-name Mucinex, but they are not because brand name Mucinex does not use carbomers containing benzene.

65.    The presence of benzene in the Products also renders the Products misbranded and therefore illegal and unfit for sale in trade or commerce.

66.    If Defendants had fulfilled their quality assurance obligations, Defendants would have identified the presence of benzene through routine and required testing.

67.    Defendant also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."[21]

68.    Defendant, as a retailer of over-the-counter drug products, also knew about high-profile recalls and citizens petitions related to the presence of benzene in drug and cosmetic

---

[21] https://monographs.iarc.who.int/wp-content/uploads/2019/07/Classifications_by_cancer_site.pdf.

products in recent years and should have been on alert to ensure that its Products did not contain benzene.

69.     Accordingly, Defendant knowingly introduced dangerous and misbranded Products containing benzene into the U.S. market.

70.     Defendants' concealment was material and intentional because people are concerned with what is in the products that they are putting into their bodies. Consumers such as Plaintiff and Class Members make purchasing decisions based on the representations made on the Products' labeling, including the ingredients listed.  This is especially true today, after numerous companies have issued recalls or resolved class action lawsuits concerning benzene contaminations in drug and cosmetic products.

71.     Defendants know that if they had not mispresented or omitted that the Products contained benzene, then Plaintiff and Class members would not have purchased the Products or would have paid less for them.

**VII.    INJURIES TO PLAINTIFF AND CLASS MEMBERS**

72.     When Plaintiff and Class members purchased the Products, they did not know, and had no reason to know, that the Products contained the harmful carcinogen benzene.  Not only would Plaintiff and Class members not have purchased the Products (or would have paid less for them) had they known the Products contained benzene, Plaintiff and Class members would also not have been capable of purchasing them if Defendants had done as the law required and tested the Products for benzene and other carcinogens and impurities, because the presence of benzene renders the Products misbranded and illegal to sell.

73.     Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must rely on Defendants to report truthfully and honestly what the Products contain on the Products' packaging or labels.

74.     Yet, when consumers look at the Products' packaging, there is no mention of benzene.  It is not listed in the ingredients section—which is where Defendant tells consumers to

look to find out what is in the Products—nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products.  Indeed, the fact that carbomers can be formulated without benzene—which brand name Mucinex is but the Products are not—supports the fact that consumers do not understand any of the ingredients to divulge the existence of benzene.  This leads reasonable consumers to believe the Products do not contain benzene.

75.    Thus, if Plaintiff and Class members had been informed that Defendants' Products contained or may contain benzene, they would not have purchased or used the Products, or would have paid significantly less for the Products, making such omitted facts material to them.

76.    Defendants' omissions and deceptive misrepresentations regarding the presence of benzene in the Product are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiff and class members.

77.    Plaintiff and Class members bargained for Products free of contaminants and dangerous substances, and that were properly and legally sold.  Plaintiff and class members were injured by the full purchase price of the Products because (i) the Products are worthless, as they are misbranded and contain harmful levels of benzene, and (ii) Plaintiff and Class members would not have purchased the Products or would have paid substantially less for them had Defendants decided to materially omit the presence of benzene.

## CLASS ACTION ALLEGATIONS

78.    Plaintiff seeks to represent a class defined as all persons in the United States who purchased the Products for personal or household use (the "Class").  Excluded from the Class are Defendants and any entities in which Defendants have a controlling interest, Defendants' agents and employees, any Judge and/or Magistrate Judge to whom this action is assigned and any member of such Judges' staffs and immediate families.

79.    Plaintiff also seeks to represent a subclass of all Class members who purchased the Products for personal or household use in California (the "California Subclass").  Excluded from the California Subclass are Defendants and any entities in which Defendants have a controlling interest, Defendants' agents and employees, any Judge and/or Magistrate Judge to whom this

action is assigned and any member of such Judges' staffs and immediate families.

80.    The Class and the California Subclass are collectively referred to as the "Classes."

81.    Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be modified, expanded, or narrowed by amendment to the complaint or narrowed at class certification.

82.    **Numerosity.** The members of the Class are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff reasonably estimates there are hundreds of thousands of members in the Class and tens of thousands of members in the California Subclass.  Plaintiff does not know the exact number of members in the proposed Classes, but reasonably believes, based on the scale of Defendants' business, that the Classes are so numerous that individual joinder would be impracticable.

83.    **Existence and Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes.  These common legal and factual questions include, but are not limited to, the following:

> (a)    whether the Products contain benzene;
>
> (b)    whether Defendants knew or should have known the Products contained benzene;
>
> (c)    whether Defendants are liable to Plaintiff and the Classes for unjust enrichment;
>
> (d)    Whether Defendants failed to disclose that the Products contain benzene;
>
> (e)    Whether Defendants misrepresented whether the Products contain benzene;
>
> (f)    whether Defendants violated the state consumer protection statutes alleged herein;
>
> (g)    whether Plaintiff and the Classes have sustained monetary loss and the proper measure of that loss;
>
> (h)    Whether a reasonable consumer would consider the presence of benzene in the Products to be material;

(i)     Whether the presence of benzene in the Products renders the Products adulterated or misbranded;

(j)     whether Plaintiff and the Classes are entitled to restitution and disgorgement from Defendants; and

(k)     whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive.

84.     **Typicality.** The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, purchased the Products, which were worthless due to the presence of benzene, a harmful and carcinogenic chemical impurity. The representative Plaintiff, like all members of the Classes, has been damaged by Defendants' misconduct in the very same way as the members of the Classes. Further, the factual bases of Defendants' misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

85.     **Adequacy of Representation.** Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that are antagonistic to those of the Classes.

86.     **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by members of the Classes are relatively small compared to the burden and expense of individual litigation of their claims against Defendants. It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

87.    In the alternative, the Classes may be certified because:

    (a)    the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendants;

    (b)    the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede her ability to protect her interests; and/or

    (c)    Defendants have acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Classes as a whole.

## CAUSES OF ACTION

### COUNT I
**Breach Of the Implied Warranty Of Merchantability
(On Behalf of The Class And the California Subclass)**

88.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

89.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the California Subclass against Defendants.

90.    Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers of the Products, impliedly warranted that the Products (i) would not contain elevated levels of benzene, (ii) are generally recognized as safe for human consumption, and (iii) that the Products were not misbranded and were not illegal to sell.

91.    Defendants breached the warranty implied in the contract for the sale of the Products because they could not pass without objection in the trade under the contract description, the Products were not of fair or average quality within the description, and the Products were unfit for their intended and ordinary purpose because the Products manufactured by Defendants contained elevated levels of carcinogenic benzene, and as such were not generally recognized as

safe for human consumption.  As a result, Plaintiff and Class and California Subclass members did not receive the goods as impliedly warranted by Defendants to be merchantable.

92.     Plaintiff and Class and California Subclass members purchased the Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

93.     The Products were not altered by Plaintiff or Class or California Subclass members.

94.     The Products were defective when they left the exclusive control of Defendants.

95.     Defendants knew that the Products would be purchased and used without additional testing by Plaintiff and Class and California Subclass members.

96.     The Products were defectively manufactured and unfit for their intended purpose, and Plaintiff and Class and California Subclass members did not receive the goods as warranted.

97.     As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class and Subclass members have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew that the Products contained harmful levels of benzene and are not generally recognized as safe for human consumption; and (b) the Products do not have the characteristics, ingredients, uses, or benefits as promised by Defendants.

**COUNT II**
**Unjust Enrichment**
**(On Behalf of The Class and the California Subclass)**

98.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

99.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class and the California Subclass against Defendants.

100.     Plaintiff and the Class and California Subclass conferred a benefit on Defendants in the form of monies paid to purchase Defendants' defective Products.

101.     Defendants voluntarily accepted and retained this benefit.

102.     Because this benefit was obtained unlawfully, namely by selling and accepting

1    compensation for medications contaminated with benzene and unfit for human use, it would be

2    unjust and inequitable for the Defendant to retain it without paying the value thereof.

3         103.    Plaintiff and Class and California Subclass members do not have an adequate

4    remedy at law and plead their claim for unjust enrichment in the alternative to their legal claims.

5    Legal remedies available to Plaintiff and Class and California Subclass members are inadequate

6    because they are not equally prompt and certain and in other ways efficient as equitable relief.

7    Damages are not equally certain as restitution because the standard that governs restitution is

8    different than the standard that governs damages.  Hence, the Court may award restitution even if it

9    determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

10    Damages and restitution are not the same amount.  Equitable relief, including restitution, entitles

11    Plaintiff to recover all profits from the wrongdoing, which may exceed the available damages at

12    law.

13                              **COUNT III**
                               **Fraud**
14              **(On Behalf of The Class and the California Subclass)**

15        104.    Plaintiff hereby incorporates by reference the allegations contained in all preceding

16    paragraphs of this complaint.

17        105.    Plaintiff brings this claim individually and on behalf of the members of the

18    proposed Class and the California Subclass against Defendants.

19        106.    Defendants engaged in material omissions of fact regarding the Products.

20    Specifically, Amneal omitted the material fact that it used carbomers formulated with benzene as a

21    solvent and included the benzene-laden carbomers into the finished dose of the Products.  CVS

22    omitted from consumers that the carbomers in its Products contained dangerous levels of benzene

23    and were not the equivalent to brand name Mucinex.

24        107.    Defendants' omissions of material fact, upon which Plaintiff and Class and

25    California Subclass members reasonably and justifiably relied, were intended to induce and

26    actually induced Plaintiff and Class and California Subclass members to purchase the Products.

27        108.    Defendants knew or should have known that the Products contained dangerously

28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                        21

1   high levels of benzene because the carbomers used in the Products were manufactured using

2   monographs which used benzene as a solvent.  As such, Defendants should have been aware of the

3   risk of benzene in the Products and taken steps to mitigate the same but failed to do so.

4         109.     Defendants were aware of prior recalls related to benzene in other drug and

5   cosmetic products since at least 2021 but continued to manufacture and sell the Products even

6   though they knew that benzene was used as a solvent in the manufacture of the Products.

7         110.     During this time, Plaintiff and Class and California Subclass members were using

8   the medication without knowing it contained dangerous levels of benzene.

9         111.     The fraudulent actions of Defendants caused damage to Plaintiff and Class and

10   California Subclass members, who are entitled to damages and other legal and equitable relief as a

11   result.

12         112.     As a result of Defendants' willful and malicious conduct, punitive damages are

13   warranted.

**COUNT IV**
**Violation Of California's Unfair Competition Law,**
14   **California Business & Professions Code §§ 17200, *et seq.***
**(On Behalf of The California Subclass)**
15

16         113.     Plaintiff incorporates by reference and re-alleges herein all paragraphs alleged

17   above.

18         114.     Plaintiff brings this claim individually and on behalf of the members of the

19   proposed California Subclass against Defendants.

20         115.     By committing the acts and practices alleged herein, Defendants violated

21   California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.* as to the

22   Class, by engaging in unlawful, fraudulent, and unfair conduct.

23         116.     Defendants violated the UCL's proscription against engaging in unlawful conduct

24   as a result of its violations of (1) CLRA, Cal. Civil Code §§ 1770(a)(5), (a)(7), (a)(9), and (a)(16),

25   and (2) California's Sherman Law as a result of selling Products that are misbranded.

26         117.     Defendants' acts and practices described above violate the UCL's proscription

27   against engaging in fraudulent conduct due to Defendants' material omissions regarding the

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED          22

Products, namely that the Products were manufactured using benzene as a solvent and contained high levels of benzene, as described more fully above.

118.    Defendants' acts and practices described above also violate the UCL's proscription against engaging in unfair conduct in that Defendants' conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive and unscrupulous as the gravity of the conduct outweighs any alleged benefits.

119.    Plaintiff and the other California Subclass members suffered a substantial injury by virtue of buying the Products in that they would not have purchased the Products absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the contaminated nature of its Products, or by virtue of paying an excessive premium price for the unlawfully, fraudulently, and unfairly marketed, advertised, packaged, and labeled Products.

120.    Plaintiff and the other California Subclass members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled. Plaintiff and the other California Subclass members are not able to test for the presence of benzene in the Products.  Thus, Plaintiff and the other California Subclass members could not have reasonably avoided the injury each of them suffered.

121.    Plaintiff and the California Subclass lost money or property as a result of Defendants' UCL violations because:  (a) they would not have purchased the Products on the same terms if they knew that the Products contained harmful levels of benzene, and are not generally recognized as safe for human consumption; and (b) the Products did not have the characteristics, ingredients, uses, or benefits as promised by Defendants.

122.    Pursuant to California Business and Professional Code § 17203, Plaintiff and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendants to: (a) provide restitution to Plaintiff and the other California Subclass members; (b) disgorge all profits obtained as a result of violations of the UCL; and (c) pay Plaintiff's and the Subclass' attorneys' fees and costs.

123.     Plaintiff does not have an adequate remedy at law and pleads her claim under the

UCL in the alternative to their legal claims.  Legal remedies available to Plaintiff and Class

Members are inadequate because they are not equally prompt and certain and in other ways

efficient as equitable relief.  Damages are not equally certain as restitution because the standard

that governs restitution is different than the standard that governs damages.  Hence, the Court may

award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support

an award of damages.  Damages and restitution are not the same amount.  Equitable relief,

including restitution, entitles Plaintiff to recover all profits from the wrongdoing, which may

exceed the available damages at law.   Further, the "unlawful" prong of the UCL is the only way

for Plaintiff to vindicate violations of the Sherman Act because the Sherman Act contains no

private right of action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

judgment against Defendants, as follows:

(a)    For an order certifying the nationwide Class and the California
Subclass under Rule 23 of the Federal Rules of Civil Procedure
and naming Plaintiff as the representative for the Class and
California Subclass and Plaintiff's attorneys as Class Counsel;

(b)    For an order declaring the Defendants' conduct violates the
statutes referenced herein;

(c)    For an order finding in favor of Plaintiff, the nationwide Class, and
the California Subclass on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to
be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable
monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper;
and

(h)    For an order awarding Plaintiff and the Class and California
Subclass their reasonable attorneys' fees and expenses and costs of
suit.

1

## **DEMAND FOR TRIAL BY JURY**

2
3

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

4
5

Dated:  September 5, 2024                          Respectfully submitted,

6

**BURSOR & FISHER, P.A.**

7

By: ___*/s/ L. Timothy Fisher*___

8
9
10

L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com

11
12
13
14
15
16
17

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*pro hac vice* forthcoming)
Andrew J. Obergfell (*pro hac vice* forthcoming)
Max S. Roberts (*pro hac vice* forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: jarisohn@bursor.com
            aobergfell@bursor.com
            mroberts@bursor.com

18

*Attorneys for Plaintiff*

19
20
21
22
23
24
25
26
27
28